Filed 8/27/24  P. v. Anderson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>LORENZO ANDERSON,<br><br>    Defendant and Appellant. | F086805<br><br>(Super. Ct. No. F16903448)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kimberley A. Donohue, and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

On April 3, 2018, the Fresno County District Attorney filed an amended information charging defendant with murder (count 1, Pen. Code, § 187, subd. (a)),[1] and attempted second degree robbery (count 2, §§ 211, 664). The information further alleged that a principal was armed with a firearm as to both counts. (§ 12022, subd. (a)(1).)

A jury convicted defendant on both counts, and he was sentenced to 25 years to life on count 1, two years on count 2, and one year on each of the firearm enhancements.

On appeal, counsel filed a *Wende* brief, and this court affirmed the judgment in *People v. Anderson* (May 6, 2020, F079134) [nonpub. opn.].[2]

On April 25, 2019, defendant filed a petition for resentencing under former section 1170.95. On May 9, 2022, the court found defendant had made a prima facie showing and scheduled a contested hearing.

After a contested hearing, the court denied defendant's petition for resentencing on July 14, 2023. Defendant appeals the order denying his petition.

## FACTS

We include below the recitation of facts from our prior appellate opinion for context.

**"Attempted Robbery Count**

"Evidence at trial established that on March 20, 2016, two young black males were standing outside a black car in the parking lot of Northeast Assembly of God Church. They were speaking with someone inside the car. The two men began running across the parking lot when one of them turned and fired several shots at the car; the car sped away. A man driving by the church saw the shots being fired and called 911.

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

[2] Respondent has requested that the record in that case be made part of the record in the present case. We grant the request.

2.

"The pastor of the church also heard the shots. Looking outside his window, he saw two men running across the parking lot. He thought both men were holding guns; one holding a gun in his left hand. He clearly saw one man with his arm extended, firing. The pastor also called 911. It was established at trial that Anderson is left handed.

"A state correctional officer standing in front of his home near the church also heard the shots, then saw a dark blue or b[l]ack car speeding past him. He followed the car and got the vehicle's license plate number. At one point, the vehicle pulled over and the driver got out and walked to the passenger side, where it appeared he was tending to the passenger. The state correctional officer eventually lost the vehicle but gave the license plate number and a photograph he took of the vehicle to the police.

"Fresno police officers were dispatched to the church and recovered two shell casings, both Winchester .40-caliber Smith & Wesson.

"Police traced the license plate number of the vehicle provided to them by the state correctional officer and located the vehicle at the registered address. There was a bullet hole in the passenger door where the bullet passed through and lodged in the floorboard. Another bullet entered from the driver's side and lodged in the dashboard.

"At the residence, police obtained statements from Andres Sanchez and Gabrielle Guerra. Guerra had a wound on her hip where a bullet grazed her. She and Sanchez had agreed to sell 10 grams of marijuana to someone, who gave the church address as the place to meet. Two men were there when they arrived. One man tried to reach into their car and grab the marijuana. Sanchez attempted to drive off, but the vehicle was in park. When Sanchez was able to drive away, the second man began shooting at them.

"Sanchez told officers he was contacted on Facebook by someone using the account name "Primetime Hustle." Sanchez described one of the men as about 20 years old, around five feet nine inches tall, and with "twisties," described as short dreadlocks with bleached tips.

"Around two weeks after the attempted robbery, Sanchez and Guerra were separately shown photo lineups of possible suspects. Anderson was in the number two position in the photo lineups. Both Guerra and Sanchez picked number two, Anderson, as one of the men who tried to rob them.

"Sanchez and Guerra were unavailable to testify at trial and the trial court permitted their preliminary hearing testimony to be admitted pursuant to Evidence Code section 1291.

"Sanchez testified at the preliminary hearing that he and Guerra arranged to sell marijuana cigarettes to someone using the Primetime Hustle Facebook account in exchange for a cell phone. The person who approached them at the church was a tall, African-American male, around 21 years old, with blond twisties in his hair, and arm tattoos. The man approached and tried to grab the marijuana, Sanchez fought back, and another man approached and fired into the car. He and Guerra drove off and went home. Guerra testified at the preliminary hearing that when they drove into the church parking lot for the exchange, an African-American male, 19 to 24 years of age, with arm tattoos, and blond twisties, approached the driver's side of their car. He reached into the car to grab the marijuana from the center console. Sanchez hit the man and the other male in the parking lot fired a shot. Sanchez started to drive off, and another bullet was fired into the car, ricocheted, and hit her.

"Guerra identified Anderson in court as one of the two men; Sanchez did not identify anyone in court.

**"Felony Murder Count**

"Tabitha Ruport and her boyfriend Ezra Dozier posted to a Facebook group that they had marijuana to sell. Ruport also helped her friend, Andrew Vann, find buyers for his marijuana. Late afternoon on March 31, 2016, Anderson contacted Ruport wanting to buy one ounce of marijuana; Ruport told him the price was $180. Ruport notified Vann they had a buyer. Anderson gave an address on East Ashlan as the meeting place, then

4.

quickly changed it to the church address, claiming the first address was a wrong address. Ruport gave the church address to Dozier and Vann.

"Dozier accompanied Vann to the church address. The two men waited at the church for 15 to 20 minutes while communicating via text messages with Ruport and Anderson. Anderson and another man eventually approached their car. Anderson displayed some money; however, he grabbed the marijuana from Vann's hand and did not hand over the money. The second man pulled out a gun and told Vann to drive away; Vann froze. Anderson "egged on" the second man urging him to shoot and the man fired two shots into the car.

"Dozier told Vann to drive away, but Vann said he could not feel his legs. He shifted the car into neutral and it coasted around the corner and stopped at the side of the church. Several bystanders and a police officer shortly arrived at their vehicle.

"Officer Eric Castillo had received a highest priority dispatch at 7:15 p.m., and arrived at the church one minute later. Castillo found Vann slumped in the driver's seat. He released Vann's seat belt and pulled him from the car. Video footage from Castillo's body camera showing an unconscious Vann gasping for breath was played for the jury. Vann was transported to the hospital by ambulance.

"Vann died from a gunshot wound to his chest. The bullet penetrated both lungs, hit a vertebra, and deflected into the chest muscle. The bullet was recovered. Officers recovered some loose marijuana and shell casings from the church property. Vann's car had bullet holes in the driver's side door and rear passenger door. A bullet was recovered in the area of the gas tank cap.

**"Additional Evidence**

"A criminalist examined the .40-caliber shell casings found at the March 20, 2016 attempted robbery and the March 31 murder of Vann. The criminalist concluded the same weapon fired both sets of casings. One casing found in the bushes of the church property was fired from a different weapon. Witnesses described seeing a single weapon

5.

on March 31, and the pastor described seeing two weapons on March 20. The prosecutor suggested the casing from the bushes had been fired on March 20, but not discovered until March 31.

"Messages conveyed via Facebook showed that on March 31, 2016, shortly before meeting Dozier and Vann at the church, Anderson was communicating with two women. He told one woman he was planning '[a] lick I'm finna hit right now.' 'Hit a lick' means to commit a robbery, or another theft offense.

"Anderson was arrested on May 31, 2016, at the East Ashlan address he initially gave Ruport. He still had bleached, or blonde, twisties in his hair. Anderson was interviewed by police and the interview was played for the jury. During the interview, Anderson provided various versions of his whereabouts at the time of Vann's shooting, but eventually admitted being present at the shooting. Anderson claimed, however, that the other man with him grabbed the marijuana from Vann and shot Vann. He also admitted involvement in the March 20 robbery. Anderson did not provide any specific information about the other perpetrator and authorities believed he was hiding the identity of the other perpetrator.

### "Procedural Matters

"On May 3, 2018, the jury returned its verdicts finding Anderson guilty on both counts and the arming enhancements true.

"Thereafter, the parties briefed the applicability of Senate Bill No. 1437, which modified the felony-murder rule, to the facts of the case. The People argued that Anderson was a 'major participant in the underlying felony and acted with reckless indifference to human life.' Alternatively, the People argued that Anderson was a person who assisted the actual shooter in the commission of murder in the first degree and that Anderson's comment to 'shoot'em' evidenced an intent to kill.

"The defense filed a written response, arguing against the application of felony murder.  The defense also filed a motion, on December 31, 2018, to set aside the murder conviction.

"Because of Anderson's age, the trial court conducted a hearing pursuant to *Miller v. Alabama* (2012) 567 U.S. 460 and *People v. Franklin* (2016) 63 Cal.4th 261, which included expert testimony.

"In addressing the murder conviction, the trial court found the 'evidence was overwhelming that [Vann's] life was taken by a shooter at the defendant's direction.'  The trial court also found that Anderson was an 'active participant.' " (*People v. Anderson*, *supra*, F079134, fns. omitted.)

### Evidentiary Hearing

The only evidence introduced at the section 1172.6 evidentiary hearing was a report by Dr. Blak offered by defendant and a motion by the People to admit the trial transcripts, which was granted.

### Dr. Blak's report

Dr. Blak's report described some of the research regarding brain development.  He observed that the frontal lobe– i.e., "the judgment center" and "inhibition center" of the brain – does not fully mature until approximately 23 to 25 years of age.  Scientific literature indicates that "at the ages of 16/17, adolescents as a group are not yet mature in ways that affect their decision making."

Defendant's composite IQ score was 83, which is "borderline."  Defendant's verbal comprehension had a percentile rank of 1.  Dr. Blak's "diagnostic impression[s]" were: generalized anxiety disorder, moderate to severe substance use disorder (in institutional remission), paranoid personality disorder, and "unspecified personality disorder (turbulent type)."  Dr. Blak observed that defendant "may" engage in ever-increasing reckless and erratic pursuits under periods of prolonged stress.

In argument before the superior court, defendant's counsel cited Dr. Blak's report to undermine the prosecution's assertion that defendant "knew he was acting with reckless indifference to human life."

***Court's Ruling***

The court made several findings of fact beyond a reasonable doubt, as quoted below:

> "The Court has reviewed the evidence submitted by Counsel, examined and read the transcripts, five volumes electronically sent to the Court and heard the arguments of counsel. There was no new or additional evidence that was presented or that the Court considered. Any findings that the Court makes the Court finds based on its review of the evidence presented and makes those findings beyond a reasonable doubt. There was evidence presented with regard to the prior incident of March 20th, 2016, and then the subject incident here March 31st, 2016. In short each of those were marijuana buys that occurred adjacent to the church at Chestnut and Olive, the latter case, subject case, happening shortly at or before 7 p.m. on that March date. And in each of the two cases -- or the two incidents, the defendant was similarly described by the witnesses, and then ultimately the defendant admitted to being present at the buy in question. The two persons who came, the defendant and a person he only identified as D.A., and had no other information or volunteering information to law enforcement, arrived together and they departed together on each of the occasions. Each of the buys was conducted and set up over a Facebook account with some related sub account and some type of messaging service utilizing Facebook to communicate and negotiate. The transaction was conducted for each of the buys. And in this case, as both parties are aware by the facts, a gun was discharged in each of the two incidents of the 20th of March and the 31st of March. Shell casings were found at each of the scenes. The first incident involved two gunshots, second incident at least two or more, and then the latter gunshot penetrated the lungs of the victim Andrew Van. In the first incident of March 20th, the gunshot may have ricocheted or come off the seatbelt buckle of the front passenger on that occasion and wounded Ms. Guerra, I believe was her last name. There was Facebook evidence that was pulled off of the website with regard to messages by the defendant and by all the parties involved in this current and subject incident. And I forget if it was Mr. -- not Mr. Van, but his -- Ezra. I forget Ezra's last name. His Facebook account or his girlfriend using the account to communicate with the buyers, who were believed to be

8.

the defendant in this case. Then at trial in this case the People argued that defendant was a major participant in the underlying felony, and acted with reckless indifference to human life. Alternatively the People argued that Anderson … himself assisted the actual shooter in the commission of the murder when he stated, Shoot him, when there was a tussle over the bag of marijuana."[3]

The court went through several factors pertinent to whether defendant was a major participant who acted with reckless indifference to human life. The court observed that defendant was present and participated in the March 31st marijuana robbery, which occurred at the same location with the same accomplice. The court also found that defendant clearly intended to aid and abet the robbery, given that he texted a girlfriend that he was about to do a "lick," minutes before the robbery occurred on March 31. The court observed that defendant and the shooter arrived in tandem, met the victim in an isolated location, and immediately threatened the victim. Defendant made a statement to the effect of "shoot him," and then backed away, and the accomplice shot the victim. The

---

[3] Here is an excerpt from Dozier's testimony in the trial transcript concerning the "shoot 'em" statement:

"Q    When you were speaking to Detective Alvarez on April 3rd of 2016, do you recall telling him that Mr. Anderson said, 'Shoot 'em,' referring to Andrew Vann?

"A    Yes.

"Q    That was the first time you ever mentioned that Mr. Anderson said, 'Shoot 'em,' is that a fair statement to make?

"A    What I literally said exactly was he basically told his friend to shoot him, if you want to get literal.

"Q    He basically told his friend to shoot him?

"A    Yes.

"Q    Okay. And that is what you tried to tell Detective Alvarez on April 3rd of 2016?

"A    Yes."

court asked rhetorical questions indicating that defendant backing away instead of trying to grab the marijuana raises the inference defendant backed away in anticipation of gunfire.

The court also concluded defendant would have known lethal weapons would be used at the March 31 robbery because they were used at the March 20 robbery, in which defendant was involved.

The court acknowledged defendant was young at the time (19 years old). However, the court concluded that the encounter was "not a function of youth and immaturity" but instead was "planned and in fact a dry run was had the week before, when in fact a firearm used."

The court summarized its ruling, "[T]he Court finds beyond a reasonable doubt that the petitioner indeed created the situation, meets the elements wherein he was a major participant acting with reckless indifference to human life, and in fact that he also aided and abetted, that there was an intent to kill by the shooter, that the defendant knew this." As a result, the court denied defendant's petition.

## DISCUSSION

### I.     Defendant Has Not Demonstrated Prejudicial Error

"In 2018, Senate Bill No. 1437(2017–2018 Reg. Sess.) (Senate Bill 1437) was enacted to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.] It accomplished this by, among other things, amending section 189 such that murder liability is not imposed on persons convicted of felony murder unless they were the actual killer, an aider and abettor who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life.

10.

"Senate Bill 1437 also created section 1170.95, which established a procedure for defendants convicted of murder under the old law to seek resentencing in the trial court if they believe they could not be convicted of that crime given the above amendment to section 189." (*People v. Wilson* (2023) 90 Cal.App.5th 903, 911–912.) That resentencing procedure is now governed by section 1172.6.

Under section 1172.6, an individual convicted of murder, attempted murder, or manslaughter under the felony-murder rule, natural and probable consequences doctrine, or any other theory under which malice is imputed based on the person's participation in a crime, may petition for resentencing. (§ 1172.6, subd. (a).) The petitioner must show that they would not be convicted of murder or attempted murder because of the changes made to sections 188 or 189 effective January 1, 2019. (*Id*., subd. (a)(3).) Among those changes is that a defendant must act with malice aforethought in order to be convicted of murder, "except as stated in subdivision (e) of Section 189." (§ 188, subd. (a)(3).) Subdivision (e) lists three grounds for imposing murder liability on a participation in the perpetration of attempted perpetration of a specified felony, one of which is pertinent here: "(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).)

Consequently, the issue presented in defendant's petition was whether he could or could not "presently be convicted of murder" (§ 1172.6, subd. (a)(3)), which in turn depends on whether he was a "major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd. (e)(3).) Here, the court determined that defendant was a major participant and acted with reckless indifference to human life and denied the petition.

### *Standard of Review*

" 'Ordinarily, a trial court's denial of a section 1172.6 petition is reviewed for substantial evidence.' (See, e.g., *People v. Vargas* (2022) 84 Cal.App.5th 943, 951 .…)

11.

Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

*Analysis*

On appeal defendant acknowledges there was largely no dispute "as to the facts found by the trial court." Instead, he contends the evidence was insufficient evidence to prove intent to kill. He acknowledges the evidence that he spoke to the shooter and stepped away before the shots were fired. However, he contends that this evidence raises an "equally likely" inference that the shooter would only fire shots to scare away the resisting victim. This argument was appropriately made to the trier of fact, but it is not a persuasive argument to an appellate court. On substantial evidence review, the fact that "circumstances might also be reasonably reconciled with a contrary finding does not warrant reversal of the judgment." (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378.) Merely identifying another inference, contrary to the one made by the finder-of-fact, is insufficient. The fact remains that the trial court's inference was supported by the evidence that defendant – who was aware that his accomplice was capable of firing shots during a marijuana robbery – told the accomplice, "[S]hoot 'em" and backed away before the accomplice did just that. Discovering substantial evidence that supports the trial court's findings ends our inquiry on substantial evidence review, even if there may be other reasonable inferences that can also be drawn.[4]

Defendant next contends that Dr. Blak's observations and research "raise[] a question" as to whether defendant was truly able to appreciate and understand that his

---

[4] Given the fact-intensive nature of the relevant inquiry, defendant's citation to cases with different factual scenarios (e.g., *People v. Underwood* (2024) 99 Cal.App.5th 303; *People v. Keel* (2022) 84 Cal.App.5th 546) is unpersuasive.

12.

accomplice would shoot and kill an occupant.  This contention misses the mark in several respects.  First, defendant said, "[S]hoot 'em," and then the accomplice did so.  This strongly cuts against any suggestion defendant did not know what would happen.  Second, on substantial evidence review, an appellant must do far more than "raise a question" regarding the evidence.  Instead, defendant must show that " ' " ' "upon no hypothesis whatever is there sufficient substantial evidence .…" ' " ' " (*People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233–234.)  The evidence that defendant had subaverage intelligence and was 19 years old does not *compel* a finding in his favor in light of the other evidence pointing the other way.

## DISPOSITION

The order denying defendant's petition is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


SMITH, J.


SNAUFFER, J.

13.